Filed 3/26/20

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br>v.<br><br>MICHAEL ANTHONY MEDEIROS,<br><br>          Defendant and Appellant. | A155648<br><br>(San Mateo County<br>Super. Ct. No. NF438558B) |

Defendant Michael Anthony Medeiros was convicted by a jury of embezzlement and grand theft of property valued in excess of $1.3 million. Medeiros raises several issues on appeal. In the published part of this opinion, we consider and reject Medeiros's claim that we should strike a Penal Code[1] former section 12022.6 enhancement because the statute was repealed before he was sentenced. In the nonpublished portion of this opinion, we consider Medeiros's remaining claims that we should (1) strike either his conviction for embezzlement or theft as they are two statements of the same offense under section 954, (2) strike the true finding on his section 186.11 enhancement because he did not commit two related felonies, (3) remand for a further hearing to determine the amount of and his ability to

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B., C., D., E., and F.

[1] All statutory references are to the Penal Code unless otherwise indicated.

pay victim restitution, and (4) amend the judgment to correct the total amount of the court security fee and criminal conviction assessment. We agree with the first, second, and fourth of these contentions, and otherwise affirm the judgment.

## I. BACKGROUND

We summarize only those facts necessary to our decision.

On June 6, 2016, the San Mateo District Attorney filed an information charging Medeiros with embezzlement by employee (§ 508; count 1); forgery[2] (§ 470, subd. (d); count 2); and grand theft of personal property valued at more than $950 (§ 487, subd. (a); count 3). As to the embezzlement and grand theft counts, the information alleged the value of the property taken exceeded $1.3 million (former § 12022.6, subd. (a)(3)) and the offenses were related felonies that involved the taking of more than $500,000 (§ 186.11, subd. (a)(2)).

Medeiros is a licensed painting contractor, who operated a business under the name Professional Painting Company, Incorporated (Professional Painting). He met Susan Lambert in the early 1990's, when she worked for a homeowners association in Hayward, to which he had submitted a bid for a painting job. Over the next several years, Medeiros did jobs at several housing complexes managed by Lambert, and painted her personal properties.

In late 1999, Lambert became the property manager for Woodlake Association (Woodlake). When Woodlake's owner decided to sell his accounts, she formed Castle Management (Castle), which acquired the Woodlake account. Lambert continued to serve as Woodlake's property manager

---

[2] The forgery charge was subsequently dismissed and the grand theft count renumbered as count 2.

2

through Castle, which contracted to provide her services to Woodlake. Lambert was Castle's sole owner and employee.

Lambert was a longtime alcoholic, predating her work at Woodlake. Between 2005 and 2007, she had a series of surgeries, and became addicted to opiates. In about 2007, she also developed a serious gambling problem, and her losses made it difficult for her to pay her bills and survive. Around that time, Medeiros told Lambert he was having some cash flow and tax problems.

Medeiros and Lambert created a plan to address their financial problems. The plan involved Lambert creating fake invoices from a fictitious company named PP, Incorporated (PPI). She created the invoices because Medeiros was computer illiterate and also because his wife worked in Professional Painting's office and he did not want her to know about it. The fake invoices were stamped and coded to look legitimate. Once a fake invoice was created, Lambert sent it to Woodlake's bookkeeper for payment. The bookkeeper would return a check payable to PPI. Lambert and Medeiros would then meet near her bank where she gave him the check, which he deposited into Professional Painting's account. He, in turn, gave her a check from Professional Painting payable to Castle for one-half the amount of the check to PPI.[3] Lambert sometimes put information in the memo line of the checks to make them look like they were for legitimate purposes.

At some point, Medeiros began creating fake invoices from Professional Painting with the help of someone in his office, and Lambert stopped creating the PPI invoices. She sometimes told Medeiros how to describe the work on an invoice. At trial, Lambert identified numerous fake invoices for work that

_____

[3] Lambert testified when they started Medeiros wanted two-thirds of the check amount, but "soon after" they "went to half and half."

3

was never done, the payments on which were fraudulent. The fake invoice scheme continued until Lambert was fired from Woodlake in September 2013, though it slowed down toward the end of her tenure. During the period of the fake invoice scheme, Professional Painting also performed legitimate jobs for Woodlake.

In September 2013, Woodlake's board president noticed invoices for advance payments to Lambert, which the board had not approved. After Woodlake terminated Lambert's employment, Woodlake's maintenance manager, Gene Bingaman, Jr., discovered invoices from PPI and Professional Painting for work that was not done. After obtaining copies of bank statements and further investigation, the board discovered approximately 150 invoices that Woodlake paid to Professional Painting or PPI for work that was not performed.

At trial, Bingaman testified regarding his review of a series of 139 invoices from Professional Painting and PPI. Bingaman testified many of the invoices were for work that was never done, and some were for work done by other contractors. He identified some invoices for work that Professional Painting did or partially did. He confirmed that Professional Painting did additional jobs beyond those reflected in invoices reviewed, estimating the number of additional jobs at between 8 and 12, definitely less than 20. Most of the invoices for those jobs were for work valued at $3,000 to $8,000.

A police investigator obtained copies of bank records, including statements and copies of cancelled checks for Woodlake, Professional Painting, Medeiros, Castle, and Lambert for the period from 2007 through 2014. From these records, he created the 139 trial exhibits, which generally included an invoice issued by PPI or Professional Painting, Woodlake's check to pay the invoice, Professional Painting's bank records showing the deposit

4

of the check, a check to Castle, and Castle's bank records showing the deposit of the Professional Painting check. From those records, the investigator prepared a summary in which he totaled the dollar amounts by year of the transactions reflected in the bank records. He determined that during the period from 2007 through 2013, Woodlake paid $2,819,868.02 to Professional Painting; Professional Painting paid $1,336,993.74 to Castle; and $1,081,827.36 was spent from the Castle account at casinos. Based on additional information from the preliminary hearing, the investigator believed the total amount paid was about $2,000 to $3,000 higher than reported in his summary. He also determined that during the period from 2007 through 2014, a total of $859,619.04 was either withdrawn from the Professional Painting account as cash, or transferred from that account into a Medeiros trust account.

The jury convicted Medeiros of both grand theft and embezzlement, and found all of the enhancements true. The court sentenced Medeiros to a seven-year prison term: the middle term of two years for grand theft (count 2), three years for the section 12022.6, subdivision (a)(3) enhancement, and two years for the section 186.11, subdivision (a)(2) enhancement. It stayed his sentence under section 654 for a two-year, middle-term sentence for embezzlement, and for all enhancements attached to that charge. Medeiros timely appealed.

## II.  DISCUSSION

### A. *Former Section 12022.6 Enhancement*

The jury found true an enhancement under former section 12022.6, subdivision (a)(3) that the amount of the loss exceeded $1.3 million. At sentencing, the trial court imposed a consecutive three-year sentence for that enhancement.

5

Several different versions of former section 12022.6 (hereafter section 12022.6) were effective during the time Medeiros committed his offenses. In 2007, the statute provided for an additional three-year term where the amount of the loss exceeded $1 million. (Stats. 1998, ch. 454, § 2, p. 3231; § 12022.6, subd. (a)(3).) The statute was amended effective January 1, 2008, to raise the loss threshold for a three-year enhancement to $1.3 million. (Stats. 2007, ch. 420, § 1, p. 3675; § 12022.6, subd. (a)(3).) That version of the statute also contained a sunset clause, under which the statute would be repealed effective January 1, 2018, unless a later enacted statute extended the date.[4] (§ 12022.6, subd. (f); Stats. 2007, ch. 420, § 1, p. 3676; Stats. 2010, ch. 711, § 5, pp. 4143–4144.) The Legislature did not enact a new version of section 12022.6 before January 1, 2018, nor has it since that time.

Medeiros was sentenced in September 2018. Relying on *In re Estrada* (1965) 63 Cal.2d 740, 748 (*Estrada*), *People v. Rossi* (1976) 18 Cal.3d 295, 301–302 (*Rossi*), and *People v. Nasalga* (1996) 12 Cal.4th 784, 790–794 (*Nasalga*), he contends we should strike the true finding and sentence on his section 12022.6 enhancement because the statute was repealed before he was sentenced and the repeal applies retroactively to him. We are not persuaded.[5]

---

[4] In 2010, Senate Bill No. 1080 (2009–2010 Reg. Sess.) reorganized Penal Code provisions relating to deadly weapons without substantive change. (Legis. Counsel's Dig., Sen. Bill No. 1080 (2009–2010 Reg. Sess., Stats. 2010, ch. 711.)

[5] After this case was fully briefed and argued, Division Six of the Second Appellate District published an opinion concluding that the repeal of section 12022.6 did not apply retroactively to defendants whose crimes were committed before the sunset date. (*People v. Abrahamian* (2020) 45 Cal.App.5th 314.) We agree with the rationale stated in that decision, and write separately to demonstrate how the express language of the statute and

6

## 1. *Legal Principles Governing Retroactive Application of Statutes Mitigating Punishment*

We begin our discussion with a review of the legal principles governing retroactive application of statutes that mitigate punishment for crimes. In *Estrada*, our Supreme Court held where a statute reduces the punishment for an offense and contains no saving clause, the amendment will apply retroactively to any case in which the judgment is not yet final before the effective date of the statute. (*Estrada, supra*, 63 Cal.2d at pp. 742, 744–745, 748.) *Estrada* concerned a prosecution for escape from prison without force or violence. After the defendant committed his crime, but before his conviction and sentence, the Legislature amended the statutes governing punishment to reduce the penalties for committing the offense. (*Id.* at p. 743.)

The Supreme Court found the defendant was entitled to the benefit of the lesser punishment. "The problem," the court explained, "is one of trying to ascertain the legislative intent—did the Legislature intend the old or the new statute to apply?" (*Estrada, supra*, 63 Cal.2d at p. 744.) Although the Legislature had constitutional authority to determine either law should apply, it did not expressly state its intent and, thus, the court was forced to "attempt to determine legislative intent from other factors." (*Ibid.*) In doing so, it found "one consideration of paramount importance"—that "[w]hen the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act." (*Id.* at pp. 744–745.) In rejecting the Attorney General's

---

legislative history support that conclusion and to address other specific arguments raised by Medeiros.

7

argument that application of a harsher penalty was supported by the general rule of prospective application of statutes and the general saving clause in section 9608, the court also relied on the "rule at common law and in this state that when the old law in effect when the act is committed is repealed, and there is no saving clause, all prosecutions not reduced to final judgment are barred." (*Estrada*, at pp. 746–747.)

Our courts have also applied the principles articulated in *Estrada* to repeal of criminal statutes. (*Rossi, supra*, 18 Cal.3d at p. 304; see *People v. McKenzie* (2020) 9 Cal.5th 40, 45.) In *Rossi*, the Supreme Court held that the repeal of a criminal statute without a saving clause leaves the court without power to proceed against a person charged with a statutory crime. (*Rossi*, at p. 304.) There, the trial court found the defendant guilty of five counts of violating former section 288a. When the defendant committed the acts, former section 288a prohibited oral copulation, even between consenting adults. On appeal, the defendant argued her conviction should be reversed because before the judgment became final, the Legislature amended section 288a so as to legalize her conduct. (*Rossi*, at p. 298.)

The California Supreme Court agreed. The court first noted that "numerous precedents demonstrate that the common law principles reiterated in *Estrada* apply a fortiorari when criminal sanctions have been completely repealed before a criminal conviction becomes final." (*Rossi, supra*, 18 Cal.3d at p. 301.) It then stated: "As the United States Supreme Court has observed, it is 'the universal common-law rule that when the legislature repeals a criminal statute or otherwise removes the State's condemnation from conduct that was formerly deemed criminal, this action requires the dismissal of a pending criminal proceeding charging such conduct. The rule applies to any such proceeding which, at the time of the

8

supervening legislation, has not yet reached final disposition in the highest court authorized to review it.' (*Bell v. Maryland* (1964) 378 U.S. 226, 230.) In the instant case, this 'universal common-law rule' mandates the reversal of defendant's conviction." (*Id.* at p. 304.)

The rule articulated in *Estrada* and *Rossi*, however, does not apply inevitably whenever the Legislature reduces or eliminates punishment for a crime. As our high court has repeatedly emphasized, the common-law rule is based on a *presumption* regarding legislative intent that governs in the absence of evidence to the contrary. (See *People v. Lara* (2019) 6 Cal.5th 1128, 1134 [whether new statute decreasing punishment applies to preenactment conduct is matter of legislative intent]; *People v. DeHoyos* (2018) 4 Cal.5th 594, 600 [*Estrada* rule rests on inference the former penalty was too severe]; *People v. Conley* (2016) 63 Cal.4th 646, 656 [*Estrada* rule reflects a presumption about legislative intent, rather than a constitutional command]; *Sekt v. Justice's Court* (1945) 26 Cal.2d 297, 304 (*Sekt*) [common-law rule that repeal of a statute operates as discharge of defendant is "based on presumed legislative intent, it being presumed that the repeal was intended as an implied legislative pardon for past acts"].) Indeed, the *Estrada* and *Rossi* cases recognized as much. (*Estrada, supra,* 63 Cal.2d at p. 744 [noting the problem is one of ascertaining legislative intent]; *Rossi, supra,* 18 Cal.3d at pp. 299, 303 [explaining common-law rule applies "in the absence of clear legislative intent to the contrary" and noting Legislature "retains the constitutional authority to preserve criminal sanctions for acts committed prior to repeal" but finding nothing in amending legislation to suggest such intent].)

Thus, rather than reflexively apply a presumption that the Legislature intended to eliminate the excessive taking enhancements for defendants like

9

Medeiros whose judgments were not final when section 12022.6 was repealed by operation of law, we must ascertain the Legislature's intent regarding the statute's sunset clause.

### 2. *In re Pedro T.*

In *Pedro T., supra,* 8 Cal.4th 1041, the California Supreme Court considered whether the *Estrada* presumption applied to a statute with a sunset clause. *Pedro T.* involved an amendment to the Vehicle Code that increased punishment for vehicle theft and provided the lesser punishment would be reinstated by 1993 unless the Legislature otherwise directed. (*Pedro T.*, at p. 1043.) As in this case, the Legislature did not amend the statute prior to the expiration of the sunset clause. Our high court concluded the minor, who committed vehicle theft during the period of increased punishment but whose conviction was not final at the time of the sunset provision, could be sentenced to the increased punishment. (*Ibid.*)

The court rejected application of the *Estrada* rule, observing that *Estrada* was based on "our quest for legislative intent." (*Pedro T.*, *supra*, 8 Cal.4th at p. 1045.) It explained: "Ordinarily when an amendment lessens the punishment for a crime, one may reasonably infer the Legislature has determined imposition of a lesser punishment on offenders thereafter will sufficiently serve the public interest. In the case of a 'sunset' provision attached to a temporary enhancement of penalty, the same inference cannot be so readily drawn." (*Ibid.*)

Looking first to the purpose of the penalty enhancement, the court found the Legislature had expressly declared its intent that the statute provide for *increased* penalties as a deterrent to the serious problem of vehicle theft, and concluded *Estrada* was not implicated on such facts. (*Pedro T.*, *supra*, 8 Cal.4th at p. 1046.) The court further rejected application

10

of the general rule that statutes are to be construed as favorably to defendants as their language and circumstances permit, noting that rule only applies "when some doubt exists as to the legislative purpose in enacting the law." (*Ibid.*)

Although the statute contained no express saving clause, the court determined it was not necessary because courts have no authority to dictate "the forms in which laws must be written to express the legislative intent." (*Pedro T.*, *supra*, 8 Cal.4th at pp. 1048–1049.) Instead, "what *is* required is that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it." (*Id.* at p. 1049.) The court then explained that "the very nature of a sunset clause, as an experiment in enhanced penalties, establishes—in the absence of evidence of a contrary legislative purpose—a legislative intent the enhanced punishment apply to offenses committed throughout its effective period." (*Ibid.*)

For reasons we will explain, the considerations articulated in *Pedro T.* apply with equal, if not greater, force here. Furthermore, our review of the text and legislative history of section 12022.6 convinces us that the Legislature, in passing the 2007 amendments, intended the provisions of former section 12022.6 to apply to defendants like Medeiros who committed their crimes before January 1, 2018.

### 3. *Section 12022.6*

In determining the effect of section 12022.6's sunset provision, we look first to its language. Section 120222.6, subdivision (f) stated: "It is the intent of the Legislature that the provisions of this section be reviewed within 10 years to consider the effects of inflation on the additional terms imposed. For that reason, this section shall remain in effect only until January 1, 2018, and as of that date is repealed unless a later enacted statute, which is

11

enacted before January 1, 2018, deletes or extends that date." (Former § 12022.6, subd. (f); Stats. 2010, ch. 711, § 5, pp. 4143–4144.)

The plain language of the statute expressly declares that the intent of the Legislature in including a sunset provision is to allow for review of the effects of inflation on the threshold amounts applicable to the prison term enhancements. The statute also expressly states "[f]or that reason" the statute will remain in effect until January 1, 2018, at which time it is repealed. It is clear from this language that the Legislature planned the conditional repeal as a mechanism to review the effects of inflation, not because it determined enhancements should no longer apply for excessive taking in 10 years. (See, e.g., *Nasalga, supra,* 12 Cal.4th at pp. 796–797 [inclusion of provisions " 'sunsetting' the entire statute . . . . bespeaks . . . an intent by the Legislature to ensure punishment under section 12022.6 will continue to be commensurate with culpability in terms of the 'real' value of the dollar . . . the Legislature clearly intends to prevent imposition of enhancements for theft of amounts unadjusted to reflect the effects of inflation"].)

As the *Pedro T.* court stated, "[d]espite broad language in *Estrada* regarding the necessity of express saving clauses, . . . courts [cannot] dictate to legislative drafters the forms in which laws must be written to express the legislative intent. Rather, what *is* required is that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it." (*Pedro T., supra*, 8 Cal.4th at pp. 1048–1049, fn. omitted.) Here, the Legislature expressed its intent with sufficient clarity by expressly stating the purpose of the sunset provision was to review the threshold loss amounts of the enhancements, not to eliminate them.

To the extent the language of the statute itself is ambiguous, however, the Legislative Counsel's Digest provides further evidence of legislative intent. It states: "This bill would state the Legislature's intent that the provisions of the bill be reviewed within 10 years to consider the effects of inflation on its provisions *and that it be applied prospectively only*." (Legis. Counsel's Digest, Assem. Bill No. 1705 (2007–2008 Reg. Sess.), italics added; *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1401 [Legis. Counsel's Dig. is indicative of legislative intent and entitled to " 'great weight' "].) The use of the singular "it" appears to refer only to "the bill," which suggests the Legislature intended that the entire bill, including the sunset provision, would apply prospectively. Moreover, the language regarding prospective application specifically follows a statement regarding the purpose of the sunset clause.[6]

This construction is also supported by the history of the legislation. The sunset provision at issue was amended in 2007 by Assembly Bill No. 1705 (2007–2008 Reg. Sess.) (hereafter Assembly Bill 1705). The legislation increased the threshold loss amounts for application of the excessive taking

---

[6] We also recognize Assem. Bill No. 1705 (2007–2008 Reg. Sess.) expressly stated: "It is the intent of the Legislature that the *amendments* to Section 12022.6 of the Penal Code by this act *apply prospectively only* and shall not be interpreted to benefit any defendant who committed any crime or received any sentence before the effective date of this act." (Stats. 2007, ch. 420, § 2, p. 3676, italics added.) We note that one of the amendments to the 2007 bill was to extend the sunset date to January 1, 2018, and thus it is reasonable to read this language to suggest the sunset provision should operate prospectively. We also recognize, as Medeiros argues, that language could be read to apply specifically to the increases in the threshold amounts which became effective upon passage of the law and to reflect legislative intent not to benefit defendants who committed their crimes *before* January 1, 2008.

enhancements and extended the sunset date by an additional 10 years to January 1, 2018.  (Stats. 2007, ch. 420, § 1.)

As first proposed and passed by the Assembly, Assembly Bill 1705 *deleted* the January 1, 2008 sunset provision, and thus extended the enhancements indefinitely.  (Assem. Bill No. 1705 (2007–2008 Reg. Sess.) as amended Apr. 10, 2007.)[7]  After referral to the Senate Committee on Public Safety, however, the statute was amended to increase the threshold amounts for the enhancements and to extend the sunset date.  (Sen. Amend. to Assem. Bill No. 1705 (2007–2008 Reg. Sess.) July 9, 2007.)

Medeiros cites the Senate Committee on Public Safety's analysis to argue the Legislature rejected making the penalties permanent.  But he fails to discuss the contents of the committee's analysis or the context of the discussion.  The committee's analysis questioned whether the sunset provision should be *eliminated* or *extended for 10 years*.  (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1705 (2007–2008 Reg. Sess.) as amended Apr. 10, 2007, June 26, 2007, p. 5 (Public Safety Committee Analysis).)  It summarized the overcrowding crisis in California prisons, noting the bill "does not appear to aggravate the prison and jail overcrowding crisis." (*Id.* at p. 4.)  Citing the author of the legislation, it observed the enhancements were "extremely important in the prosecution of 'white collar' crime in California" by allowing harsher penalties for theft of property worth millions of dollars, and described the enhancements as "very useful to law enforcement." (*Id.* at pp. 4–5.)

---

[7] Assembly Bill No. 1705 was originally introduced as an act to amend section 530.5 relating to identity theft, but was amended on April 10, 2007 to amend section 12022.6.  (Assem. Bill No. 1705 (2007–2008 Reg. Sess.) as introduced Feb. 23, 2007; Assem. Bill No. 1705 (2007–2008 Reg. Sess.) as amended Apr. 10, 2007.)

14

The Public Safety Committee Analysis also explained this history of the sunset provision in section 12022.6: "The so-called excessive taking enhancement in [s]ection 12022.6 became effective in 1977, essentially contemporaneous with the Determinate Sentencing Law. It appears that a sunset provision became effective in 1990. The sunset clause was rewritten through legislation in 1992. The provision was designated subdivision (f) in 1996. The sunset was extended from 1998 to 2008 by AB 293 (Cunneen), Chapter 551, Statutes of 1997. The existing sunset provision states that the purpose of the provision is to allow the Legislature to consider the effects of inflation on the enhancements thresholds in the law." (Public Safety Committee Analysis, *supra*, at p. 5, fn. omitted.) The analysis then reported on the effects of inflation on the existing loss thresholds as calculated using the Consumer Price Index. (Public Safety Committee Analysis, at pp. 5–6.)

Nowhere in the Public Safety Committee Analysis do we find any reference to whether the enhancements might constitute excessive punishment or whether the statute should be subject to outright repeal. Indeed, the only question raised was whether to eliminate or extend the time frame to review the threshold amounts for the effects of inflation. Moreover, the discussion of the history of the sunset provisions shows the Legislature had repeatedly and consistently extended the sunset date in the past in order to consider the effects of inflation.

Further, in enacting the 2007 amendments, the Legislature considered the Assembly Floor Analysis, which summarized the effect of the Senate amendments to the bill as follows: "1) Raise the monetary threshold of the excessive taking enhancements. [¶] 2) State it is the intent of the Legislature to review the excessive taking enhancements within 10 years to consider the effects of inflation." (Assem. Floor Analysis, Conc. in Sen. Amend. of Assem.

15

Bill No. 1705 (2007–2008 Reg Sess.) as amended July 9, 2007, Sept. 5, 2007, p. 1.) The analysis also reiterated that the legislation was considered an important deterrent to white collar crime, was " 'extremely useful' " to law enforcement, and historically had " 'overwhelming' " support from the Legislature. (*Id.* at p. 3.) That understanding of its purpose is bolstered by the fact that the 2007 bill passed with the unanimous consent of both houses, had no opposition, and continued the historic pattern of adjusting the enhancement amounts to account for inflation and extending the sunset date. These facts, combined with the retention of express language in the statute regarding intent to review the threshold amounts for the effects of inflation, is persuasive evidence that the Legislature intended the sunset provision to operate as it had in the past—as an opportunity to review the loss thresholds, not as a permanent repeal of the enhancements.

### 4. *The Repeal of Section 12022.6 Does Not Apply Retroactively*

Medeiros raises several contentions in asserting that his three-year section 12022.6 enhancement should be stricken.

First, Medeiros relies on *Estrada* and its progeny to argue that when the Legislature amends a statute to reduce punishment without an express saving clause, the new statute applies retroactively to all defendants whose judgments are not final. As discussed above, however, *Estrada* applies only in the absence of clear legislative intent to the contrary. It is based on a presumption that the Legislature, in amending a statute to reduce punishment, has expressed its determination that the former penalty was too severe. (*Estrada*, *supra*, 63 Cal.2d at pp. 744–745.) Here, the text of the statute and history of the legislation make clear that the purpose of section 12022.6 was to provide harsher penalties for theft of high dollar amounts of property as an important tool for law enforcement in combatting white collar

16

crime.[8] The express language *of the sunset provision* itself states its purpose is to allow the Legislature to review the threshold amounts of the enhancement for inflation, not to allow the Legislature to consider whether the enhancements should continue to apply or whether the statute should be repealed. There is no indication that in passing the 2007 amendments the Legislature contemplated the statute might lapse, particularly in light of the consistent history of extensions of the sunset date. Thus, it is not "an inevitable inference" here, as it was in *Estrada,* that the Legislature intended to impose a lesser punishment on defendants like Medeiros. (*Estrada*, at p. 745.)

Medeiros also contends that the Legislature, "when conducting the subsequent mandatory review under the statute[,] chose not to continue imposing [the excessive taking enhancements], indicating its belief they are not necessary. Since the Legislature determined the penalties are not needed, and eliminated them, the repeal should operate retroactively." For several reasons, we reject this claim.

First, in discerning the legislative intent underlying former section 12022.6 and its sunset clause, we must consider the Legislature's purpose at the time it enacted the statute. (*Pedro T.*, *supra*, 8 Cal.4th at p. 1048.) As the *Pedro T.* court explained, "legislative inactivity *after* the passage of the sunset provision casts no light on the Legislature's intent *when it enacted the*

---

[8] Medeiros argues the 2007 amendment mitigated punishment by increasing the threshold amounts. But Medeiros does not argue that mitigation had any effect on him, presumably because he met the statutory threshold for a three-year enhancement under all versions of the statute. (Compare *Nasalga*, *supra*, 12 Cal.4th at p. 797 [1997 amendment to § 12022.6 had ameliorative effect as to the defendant because the increase in threshold amounts would mean she was eligible for only one-year enhancement rather than two-year enhancement].)

17

*statute. . . .* [T]o seek a hypothetical legislative intent at some time after enactment of the statute would seem necessarily to disregard the probable legislative intent at the time of the enactment. We are directed to no authority sanctioning such an approach." (*Id.* at pp. 1047–1048.) The court further observed that even if it "were to adopt the unorthodox approach . . . [of] embark[ing] on a search for hypothetical post-enactment legislative intent based on legislative silence," it "found no facts to suggest that, as of the time of the minor's offense, the original legislative aim had somehow ceased to operate, and it is impossible to discern at what point, if any, during the period of legislative inactivity the Legislature might have determined to let its experiment in enhanced penalties terminate as to all criminal proceedings not yet final as of the sunset date. Much truer to the original legislative purpose . . . is a determination the provision for enhanced penalties shall apply to all vehicle thefts committed during its stated effective period." (*Id.* at p. 1048.) We find the same is true here of section 12022.6's sunset provision.

Medeiros argues that the Legislature "determined the penalties [were] not needed" by failing to extend the sunset date or promptly reenact section 12022.6 after the statute was repealed on January 1, 2018, by operation of the sunset clause. But as we now discuss, the Legislature's subsequent actions demonstrate its determination that the penalties *were* needed.[9] In 2018, the Legislature passed new legislation reinstating section 12022.6, allowing a court to impose one-, three-, and four-year enhancements with

---

[9] Accordingly, we need not consider the effect on the retroactivity analysis were a subsequent Legislature to take action, whether by affirmatively declining to reenact a repealed statute or otherwise, that indicated an intent that the repealed statute not apply to defendants with nonfinal judgments.

18

increased penalty threshold amounts and *no sunset provision*.  The legislation was vetoed by the Governor, but that Assembly floor analysis expressly states section 12022.6 was "inadvertently" repealed on January 1, 2018.  (Assem. Floor Analysis, Conc. in Sen. Amendments of Assem. Bill No. 1511 (2017–2018 Reg. Sess.) as amended May 22, 2018, Aug. 24, 2018, p. 1.)  The urgency legislation passed both houses with no opposition and expressly included language stating it was "an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the California Constitution and shall go into immediate effect. The facts constituting the necessity are: [¶] In order to restore a valuable deterrent to the significant economic damage caused by excessive taking, including sophisticated white collar fraud schemes, it is necessary that this act take effect immediately." (Assem. Bill No. 1511 (2017–2018 Reg. Sess.) § 3.)  If anything, such legislative activity reflects intent *not* to repeal the enhancements in 2018.

Next, Medeiros argues that this case differs from *Pedro T.* because *Pedro T.* involved a *temporary experiment* in enhanced penalties.  He contends the *Pedro T.* court relied on the Legislature's expressed view that increased penalties were in the best interest of public safety and found the utility of the three-year experiment in that case would be undermined if the increased penalty did not apply throughout the experimental period.  But Medeiros does not explain how this factual difference regarding the technical operation of the law affects the analysis regarding legislative intent to impose the penalty enhancement here.  Rather, it seems the fact that the 2007 amendment in this case was not a temporary experiment but a continuation of a longstanding policy of imposing harsher penalties for excessive taking reflects even stronger legislative intent that the enhancements apply

19

throughout the effective period of the law. There is no hint in the legislative history that the Legislature in 2007 thought "imposition of a lesser punishment" by *eliminating* the enhancements in 2018 might sufficiently serve the public interest. (*Pedro T.*, *supra*, 8 Cal.4th at p. 1045.) Medeiros concludes "what was important in *Pedro T.* was the Legislature's clear preference for imposing the increased penalty." We agree—we just find that the same clear preference is demonstrated under slightly different facts here.

We also agree with the policy consideration highlighted in *Pedro T.* that "a rule that retroactively lessened the sentence imposed on an offender pursuant to a sunset clause would provide a motive for delay and manipulation in criminal proceedings. When the Legislature signals, years in advance, its intention to reduce the punishment for an offense, defendant and counsel have a strong incentive to delay the finality of a judgment in the hope of eventually receiving the lessened, post-sunset term. . . . The Legislature could not have intended to encourage such machinations." (*Pedro T., supra,* 8 Cal.4th at pp. 1046–1047.) That principle is equally applicable here.

Medeiros next relies on *Rossi, supra,* 18 Cal.3d 295 and *People v. Hajek and Vo* (2014) 58 Cal.4th 1144 (*Hajek*), overruled on another ground in *People v. Rangell* (2016) 62 Cal.4th 1192, 1216, to argue the *Estrada* retroactivity rule applies when the Legislature completely repeals penal sanctions. But neither case involved a sunset clause. *Rossi* was also distinguishable because it involved decriminalization of conduct. "When the Legislature has seen fit to repeal a statute making certain acts a crime it is reasonable to assume that in the absence of a saving clause the Legislature would not have desired that anyone should be punished for what, by the repeal, it has now determined is not a crime." (*Sekt, supra,* 26 Cal.2d at

p. 308.) Here, by contrast, there was no elimination of liability for theft, and thus no implied legislative pardon for Medeiros's actions.

In *Hajek*, the court found a firearms enhancement under section 12022.5 must be stricken because the defendant had committed his crime with a pellet gun and the Legislature had amended the statute to remove pellet guns from the definition of "firearm" before his judgment became final. (*Hajek*, *supra*, 58 Cal.4th at pp. 1195–1196.)[10] Unlike in this case, however, the court did not discuss any evidence of legislative intent rebutting the *Estrada* presumption. Here, for the reasons discussed above, we find such evidence in both the text of the statute and its legislative history.

Finally, Medeiros relies on *Nasalga*, *supra*, 12 Cal.4th 784, to argue section 12022.6 applies retroactively. In *Nasalga*, our Supreme Court considered the retroactive effect of a prior version of section 12022.6. There, the defendant was convicted and sentenced to a two-year enhancement based on her theft of property valued at $124,000. After she had committed her crimes, but before she was charged, the statute was amended to raise the threshold for the enhancement to $150,000. (*Nasalga*, at pp. 787–788.) Our high court concluded that under *Estrada,* Nasalga was entitled to the benefit of the lesser punishment of a one-year enhancement under the adjusted threshold loss amounts. (*Nasalga*, at pp. 787, 797–798.) After the *Nasalga* decision, however, the Legislature amended section 12022.6 to provide the statute should operate prospectively, and should not be deemed to benefit any

_____

[10] We also note that *Hajek* is distinguishable from this case because the amendment to section 12001 defining "firearm" did not eliminate the law holding a pellet gun to be a deadly weapon within the meaning of section 12022, subdivision (b) and, thus, the court replaced the firearm use enhancements with deadly or dangerous weapon use enhancements. (*Hajek*, *supra*, 58 Cal.4th at pp. 1196–1197.)

21

defendant who committed a crime before the effective date of the statute. Moreover, *Nasalga* did not address the retroactive or prospective effect of the statute's sunset clause and, accordingly, it is of no assistance to Medeiros.

In sum, we conclude despite the lack of an express saving clause in section 12022.6, the text of the statute and its legislative history demonstrate with sufficient clarity that the Legislature intended its provisions to apply to defendants who committed their crimes before January 1, 2018.

## B. *Section 954*

Medeiros was convicted of one count each of embezzlement and grand theft. He contends under section 954 and *People v. Vidana* (2016) 1 Cal.5th 632 (*Vidana*), he cannot be convicted of both embezzlement and grand theft based on the same course of conduct, because embezzlement and theft are different statements of the same offense. Accordingly, he asks us to strike one of his two convictions.

Section 954 provides, in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged . . . ."

In *Vidana,* our Supreme Court considered whether a defendant could be convicted of both grand theft and embezzlement based on the same course of conduct. (*Vidana, supra,* 1 Cal.5th at p. 635.) There, the defendant worked as a credit agent responsible for ensuring invoices were paid by her

22

employer's customers.  Over the course of a year, the defendant underreported $58,000 in cash payments from 12 different customers.  The trial court instructed the jury on both grand theft by larceny under section 484, subdivision (a) and grand theft by embezzlement under section 503.  The jury returned guilty verdicts on both charges.  (*Vidana*, at pp. 635–636.)

The court first considered whether larceny and embezzlement were different offenses, or different statements of the same offense of theft.  (*Vidana*, *supra*, 1 Cal.5th at pp. 647–648.)  Though larceny and embezzlement have different elements, are located in separate sections of the Penal Code, and neither is a lesser included offense of the other, the court nonetheless concluded they are different statements of the same offense.  (*Vidana*, at pp. 648–649.)  Looking to the legislative history of the 1927 amendment to section 484, the court observed the Legislature provided that the amendment " 'consolidates the present crimes known as larceny, embezzlement and obtaining property under false pretenses, into one crime, designated as theft,' " and expressly stated, " '[W]herever any law or statute of this state refers to or mentions larceny, embezzlement, or stealing, said law or statute shall hereafter be read and interpreted as if the word 'theft' were substituted therefor.' " (*Vidana*, at p. 648.)  The court explained the "obvious intent" of the statute "was to create a single crime of theft."  (*Ibid.*)

Having concluded larceny and theft were not separate offenses, the court went on to consider whether section 954 would permit multiple convictions for different statements of the same offense.  (*Vidana*, *supra*, 1 Cal.5th at p. 649.)  The court recognized the statute defines three categories of charges that can be joined in one action: " '*different offenses* connected together in their commission,' '*different statements* of the same offense,' and '*different offenses* of the same class of crimes or offenses.' " (*Id.* at p.650,

quoting § 954, italics added by *Vidana*.) Of these three categories, however, the language of section 954 permits convictions only for "different offenses connected together in their commission" and "different offenses of the same class of crimes or offenses," but *not* for "different statements of the same offense." The latter is different from the other two categories in that " 'it concerns an alternative means of pleading *the same* offense rather than a different one.' " (*Vidana*, at p. 650.) The court thus concluded the " 'most reasonable construction of the language in section 954 is that the statute authorizes multiple convictions for different or distinct offenses, but does not permit multiple convictions for a different statement of the same offense when it is based on the same act or course of conduct.' " (*Ibid.*)

We agree with Medeiros that consistent with our Supreme Court's guidance in *Vidana*, his dual convictions for grand theft and embezzlement cannot stand because they are different statements of the same offense under section 954 and they were both alleged and prosecuted based on the same course of conduct.

As an initial matter, neither party disputes that grand theft and embezzlement are different statements of the same offense. (See *Vidana*, *supra*, 1 Cal.5th at pp. 647–649; §§ 503, 508, 484, 487, 490a; *People v. Gonzales* (2017) 2 Cal.5th 858, 865–866 [theft encompasses larceny, embezzlement, and false pretenses]; *People v. Hussain* (2014) 231 Cal.App.4th 261, 272, fn. 5 [accused may be convicted of grand theft based on larceny, embezzlement, or obtaining money by false pretenses].)

The Attorney General argues, however, that *Vidana* is distinguishable because there the defendant was an employee who was convicted of embezzlement and larceny "arising from the *same conduct*—taking money from customer cash receipts," whereas Medeiros was convicted of the two

24

crimes based on separate acts. Specifically, on the embezzlement count, the Attorney General argues Medeiros was not an employee or agent of Woodlake, but aided and abetted Lambert in stealing from the company by agreeing to submit false invoices, depositing checks for work he did not perform into his company bank account, and writing checks from Professional Painting to Castle Management, which Lambert then deposited into her company bank account. The grand theft count, on the other hand, was based on "transactions separate and apart from funneling money to Lambert" that occurred when Medeiros accepted $1.4 million from Woodlake for work not performed and retained money from the checks he deposited into his company bank account.

As the *Vidana* court explained, however, section 954 " 'authorizes multiple convictions for different or distinct offenses, but does not permit multiple convictions for a different statement of the same offense when it is based on the same act or *course of conduct.*' " (*Vidana, supra*, 1 Cal.5th at p. 650, italics added.) In this case, both the embezzlement and the grand theft charges were based on the same scheme to steal money from Woodlake that involved presenting false invoices and having Medeiros accept payment and deposit checks into his company bank account. Though there were multiple transactions over the course of six years, under both the embezzlement and grand theft counts they were all charged as one offense based on the same *course of conduct*. Likewise, both the embezzlement and the grand theft were complete when Medeiros deposited the checks into his company bank account. The fact that Medeiros subsequently kept some of the proceeds and "funneled" some to Lambert does not change the fact that the theft offense was complete when he accepted payment for work not performed and deposited it into Professional Painting's account.

25

Our conclusion is also supported by the *Vidana* court's explanation that prohibiting multiple convictions for different statements of the same offense is consistent with the rule prohibiting multiple convictions based on necessarily included offenses. As the court stated: " '[I]t logically follows that if a defendant cannot be convicted of a greater and lesser offense based on the same act or course of conduct, *dual convictions for the same offense based on alternate legal theories* would necessarily be prohibited.' " (*Vidana, supra,* 1 Cal.5th at p. 650, italics added.) Here, aider and abettor liability on the embezzlement count was an alternate theory on which Medeiros was liable for the same offense as the grand theft count, but it was not based on a different actus reus or a different course of conduct. (See § 31 [aiders and abettors are principals in any crime committed]; *People v. Coyle* (2009) 178 Cal.App.4th 209, 217 [defendant could not be convicted of three counts of murder for killing one person where three counts simply alleged alternative theories of the offense].) Because embezzlement was merely an alternative way of committing the same offense of theft, we conclude Medeiros cannot be convicted of both embezzlement and grand theft based on the same course of conduct which comprised the scheme to steal from Woodlake.

Medeiros has requested we strike either his embezzlement or grand theft conviction, but neither Medeiros nor the Attorney General has suggested which of the two should be stricken. Because the trial court imposed a sentence on the grand theft count and imposed but stayed the sentence on the embezzlement count under section 654, we will reverse and vacate the conviction on the embezzlement count.

## C. *Section 186.11 Enhancement*

The jury also found true an aggravated white collar enhancement under section 186.11, subdivision (a)(2), for which the trial court imposed a

two-year sentence.  Section 186.11, subdivision (a) provides that any person "who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct," and which involve the taking of more than $500,000, shall be punished by an additional term of two, three, or five years.  (§ 186.11, subd. (a)(1), (2).)  A " 'pattern of related felony conduct' means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events."  (§ 186.11, subd. (a)(1).) " '[T]wo or more related felonies' means felonies committed against two or more separate victims, or against the same victim on two or more separate occasions."  (*Ibid.*)

Medeiros contends because he was improperly convicted of two felonies, there is insufficient evidence to support the true finding on the aggravated white collar enhancement.  We agree.  As discussed above, because Medeiros could only be convicted of either grand theft or embezzlement based on the same course of conduct, the section 186.11, subdivision (a)(2) enhancement must be stricken.

## D.  *Victim Restitution*

At Medeiros's sentencing hearing, the trial court ordered him to pay restitution to Woodlake in the amount of $2.84 million plus a 15 percent administrative fee pursuant to section 1203.1, subdivision (*l*), jointly and severally with Lambert.  Medeiros does not contest the imposition of the administrative fee, but argues the $2.84 million is unsupported by substantial evidence.

At sentencing, the trial court did not explain the basis of its victim restitution order.  The probation report, however, recommended that

27

Medeiros pay $2.84 million in restitution to Woodlake, plus a 15 percent administrative fee under section 1203.1, jointly and severally with Susan Lambert.  The probation report stated:  "[Woodlake] is requesting restitution in the amount of $2,840,000.  As of June 7, 2018, documentation (a spreadsheet) has not yet been provided to the Probation Department, but it reportedly substantiates this amount.  The board president previously indicated that the document is likely to be submitted to the Court at the time of sentencing."  It is apparently undisputed that no spreadsheet or other documentation was provided at the time of sentencing to support this request, nor does any appear in the record.  Medeiros argues because the $2.84 million amount in the probation report was unsupported by any evidence and is inconsistent with the evidence presented at trial regarding the amount of Woodlake's loss, we should remand for a new hearing on victim restitution.

The Attorney General argues Medeiros has forfeited his challenge to the amount of restitution by failing to raise it below.  We agree.

The failure to raise an objection in the trial court to the amount of a restitution order results in forfeiture of that argument on appeal.  (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075 (*Brasure*); *People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218; *People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468–1469 [restitution fine].)  In *Brasure,* the defendant had challenged a restitution order on the ground the victim's loss "was not shown by documentation or sworn testimony."  (*Id.* at p. 1075.)  In holding the defendant had not preserved the contention for appeal, our high court stated:  "[B]y his failure to object, defendant forfeited any claim that the order was merely unwarranted by the evidence, as distinct from being unauthorized by statute.  [Citation.]  As the order for restitution was within the sentencing

court's statutory authority, and defendant neither raised an objection to the amount of the order nor requested a hearing to determine it [citation], we do not decide whether the court abused its discretion in determining the amount." (*Ibid*.) Here, too, Medeiros neither objected to the restitution award nor requested a hearing on the matter. Accordingly, under *Brasure*, he has forfeited his challenge to the sufficiency of the evidence supporting the restitution award.

Medeiros contends *Brasure* is distinguishable because the "defendant's argument went not to the sufficiency of the evidence, since the victim presented evidence of her loss and itemized it for the probation officer, but to how the trial court weighed that evidence." Medeiros further argues *Brasure* "simply recognizes the rule that once the victim makes a prima facie case of his or her loss, the burden shifts to defendant to demonstrate the amount of the loss is other than that claimed." We are not persuaded. First, nowhere in *Brasure* does the opinion indicate the victim presented evidence of her loss and itemized it for the probation officer. The opinion merely states the victim's mother *told* the probation officer she had incurred $2,500 in expenses while attending the trial and lost "approximately $100,000 in wages because she 'has been unable to work for the past two years.'" (*Brasure, supra*, 42 Cal.4th at p. 1074.) We fail to see how this is materially different from the statement in the probation report here that Woodlake is requesting $2.84 million in restitution. Also, there, as here, the defendant's argument on appeal was that the order was unsupported by documentation or sworn testimony. (*Id.* at p. 1075.) Nor does the *Brasure* opinion discuss burden shifting in the context of a restitution hearing. Medeiros's analysis ignores the clear holding of our Supreme Court, by which, of course, we are bound.

Nor do *In re K.F.* (2009) 173 Cal.App.4th 655 and *In re Travis J.* (2013) 222 Cal.App.4th 187, cases on which Medeiros relies, dictate a contrary result. First, we find *Travis J.* unhelpful because it did not discuss *Brasure* at all, but relied on *In re K.F.* with no discussion. (*In re Travis J.*, at pp. 202–203.) *In re K.F.*, in turn, is distinguishable, because there the court considered a challenge to the sufficiency of the evidence in the context of whether certain components of the restitution order were authorized by statute. (*In re K.F.*, at pp. 660–661.) Medeiros raises no such challenge here. Further, *In re K.F.* was decided before our Supreme Court's decisions in *People v. McCullough* (2013) 56 Cal.4th 589 and *People v. Anderson* (2010) 50 Cal.4th 19. In *Anderson*, the court concluded the defendant had forfeited his objection to the amount of restitution by failing to object in the trial court. (*Anderson*, at p. 26, fn. 6.) In *McCullough*, it held a challenge to the sufficiency of the evidence supporting a similarly factually based sentencing decision (the ability to pay a booking fee) was forfeited by the failure to raise it below. (*McCullough*, at p. 597.) *McCullough* distinguished *People v. Butler* (2003) 31 Cal.4th 1119, on which the *In re K.F.* court had relied, because *Butler* concerned the legal issue of probable cause, whereas the defendant's ability to pay a booking fee is "confined to factual determinations." (*McCullough*, at pp. 596–597.) The question here, as in *McCullough*, is one of factual support for the challenged order.

As the court explained in *People v. Garcia*, *supra*, 185 Cal.App.4th at page 1218, "The appropriate amount of restitution is precisely the sort of factual determination that can and should be brought to the trial court's attention if the defendant believes the award is excessive." Had Medeiros objected to the adequacy of the proof of the rather significant restitution award in this case, the court could have held a restitution hearing at which

the prosecution would have been required to present evidence and Medeiros would have had an opportunity to challenge it.  Accordingly, rejection of Medeiros's claim is fully consistent with the "considerations of judicial economy" underlying the forfeiture doctrine.  (*People v. Gibson*, *supra*, 27 Cal.App.4th at p. 1469.)

## E.  *Ability to Pay Victim Restitution*

Medeiros next contends the trial court deprived him of his state and federal rights to due process by failing to hold a hearing to determine whether he is able to pay the victim restitution order.  He relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, in which Division Seven of the Second Appellate District held trial courts must "conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before requiring a defendant to pay assessments under Government Code section 70373 and Penal Code section 1465.8 or a restitution fine under section 1202.4, subdivision (f).  (*Dueñas*, at p. 1164.)  Acknowledging that *Dueñas* did not address victim restitution,[11] Medeiros nonetheless urges us to apply its holding here, arguing the "reasoning applies equally" to the trial court's victim restitution order.

In *Dueñas*, the defendant, a homeless probationer who suffered from cerebral palsy and was unable to work, was convicted of her fourth offense of driving with a suspended license.  (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160–1161.)  At sentencing, she objected she did not have the ability to pay the fines and fees.  The court struck some fees, but imposed others it concluded were mandatory.  (*Id.* at pp. 1162–1163.)  The appellate court

---

[11] The *Dueñas* court noted that direct victim restitution was not ordered and was not at issue in that case.  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1169.)

reversed, concluding "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments." (*Id.* at p. 1164.) The appellate court also held that while section 1202.4 precludes consideration of a defendant's ability to pay a restitution fine "unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, at p. 1164.)

Medeiros's reliance on *Dueñas* is misplaced. As our colleagues in Division Four recently explained, restitution fines and criminal assessments are fundamentally different from victim restitution. (*People v. Evans* (2019) 39 Cal.App.5th 771, 776 (*Evans*).) The Government Code section 70373 and Penal Code section 1465.8 assessments at issue in *Dueñas* are intended to fund court facilities and operations, while the section 1202.4, subdivision (f) restitution fine is intended to be additional punishment for a crime. (*Dueñas, supra,* 30 Cal.App.5th at pp. 1165, 1169; *Evans,* at p. 777; see *People v. Allen* (2019) 41 Cal.App.5th 312, 321.) Victim restitution, on the other hand, compensates " 'the victim for economic losses caused by the defendant's criminal conduct, i.e., to make the victim reasonably whole.' " (*Evans,* at p. 777.) Furthermore, " 'A victim's right to restitution is . . . a constitutional one; it cannot be bargained away or limited, nor can the prosecution waive the victim's right to receive restitution.' " (*Allen,* at p. 321.) Moreover, section 1202.4, subdivision (g) *expressly* states "[a] defendant's inability to pay shall not be a consideration" in determining the amount of a direct victim restitution order.

In light of the significant differences between victim restitution and the fines and assessments at issue in *Dueñas,* we conclude the trial court was not required to consider Medeiros's ability to pay prior to setting a victim restitution award under section 1202.4, subdivision (f). (See *Evans, supra,* 39 Cal.App.5th at p. 777.)

## F. *Court Operations Fee and Criminal Conviction Assessment*

Finally, Medeiros contends the trial court erred in imposing a court operations fee under section 1465.8, subdivision (a)(1) and a criminal conviction assessment under Government Code section 70373, subdivision (a)(1) for both the grand theft and embezzlement counts. We agree. For the reasons discussed above in part II.B. of this opinion, Medeiros was improperly convicted of two crimes comprising one offense based on the same course of conduct. Accordingly, on remand the trial court should reduce the total amount of the court operations fee to $40 and the criminal conviction assessment to $30.

## III. DISPOSITION

We reverse Medeiros's conviction for embezzlement for the reasons stated in the nonpublished portion of this opinion, and remand for further proceedings consistent with this opinion. On resentencing, the trial court shall strike the section 186.11, subdivision (a)(2) enhancement, and reduce the total amount of the court operations fee (§ 1465.8, subd. (a)(1)) to $40 and the criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)) to $30. As modified, the judgment is affirmed. The trial court is directed to forward an amended abstract of judgment to Medeiros and the Department of Corrections and Rehabilitation.

_____
Margulies, J.

We concur:


_____
Humes, P. J.


_____
Sanchez, J.

A155648
*People v. Medeiros*

Trial Court:         San Mateo County Superior Court

Trial Judge:         Hon. John L. Grandsaert

Counsel:

Jeffrey A. Glick, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Rene A. Chacon and Julia Y. Je, Deputy Attorneys General for Plaintiff and Respondent.